**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**TRIXY E. ENDEMANO,**

                **Plaintiff,**

**v.**                                     **Case No:  6:13-cv-348-Orl-36TBS**

**SECRETARY, DEPARTMENT OF**
**HOMELAND SECURITY,**

                **Defendant.**

_____

## ORDER

      This cause comes before the Court upon Defendant Secretary of the Department of Homeland Security's (the "Secretary") Amended Motion to Dismiss Plaintiff Trixy E. Endemano's ("Endemano") Complaint ("Motion to Dismiss") (Doc. 21).   Endemano filed a response in opposition to the Motion to Dismiss (Doc. 24).  For the reasons that follow, the Motion to Dismiss will be granted in part and denied in part.

**I.**      **BACKGROUND**

      **A.**      **Facts[1]**

      This action arises from Endemano's allegations that during a period from September 2007 through October 2009, she was subjected to sex discrimination, a hostile work environment, and retaliation by her employer, the Transportation Security Administration ("TSA"), primarily due to the actions of her supervisor, James Zloto ("Zloto").  *See* Doc. 12.

---

[1] The following statement of facts is derived from the Amended Complaint (Doc. 12), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).

The TSA, a component of U.S. Department of Homeland Security ("DHS"), is responsible for protecting the Nation's transportation systems, including aviation. *See* Transportation Security Administration, Mission, Vision and Core Values (Jan. 14, 2014), http://www.tsa.gov/about-tsa/mission-vision-and-core-values. The Federal Air Marshal Service ("FAMS") is a unit of the TSA that seeks to protect the Nation's aviation system by deploying Federal Air Marshals ("FAMs") to detect, deter, and defeat hostile acts targeting U.S. air carriers, airports, passengers, and crews. *See* Transportation Security Administration, Federal Air Marshals (Feb. 26, 2013), http://www.tsa.gov/about-tsa/federal-air-marshals. At all times relevant hereto, Endemano was employed by the TSA as a FAM based in the Tampa regional FAMS office, which falls under the direction of the Orlando Field Office. Doc. 12 ¶¶ 6, 16. Endemano was originally based in the Washington, D.C. Field Office, but was transferred to the Tampa office in September 2007. *Id.* ¶¶ 15–16. Zloto, an Assistant to the Special Agent in Charge ("ATSAC") with the FAMS, was Endemano's direct supervisor and worked primarily in the Tampa office, although he reported to his supervisors in Orlando. *Id.* ¶ 17. Endemano alleges that almost immediately upon her transfer to the Tampa office, she was subjected to a series of acts of sex discrimination and abusive conduct by Zloto, as detailed below. *Id.* ¶ 16.

On October 1, 2007, Endemano had a personal emergency and was forced to call out of work for the next day. *Id.* ¶ 22. It was late at night and Endemano was only carrying her personal phone, so she called the mission operation center to get Zloto's phone number. *Id.* When she called, Endemano was unknowingly given the phone number for Greg Mertz ("Mertz"), who is the assistant to the federal security director. *Id.* Endemano called the number, not realizing that she was speaking to Mertz, and at no point did Mertz ever correct her. *Id.* Endemano advised Mertz that she needed to call out sick and he told her he would get someone else to fill in for her.

2

*Id.* The next morning at approximately 8:30 a.m., Endemano received a phone call from Zloto, who immediately screamed at her, exclaiming "How can you be so dumb as to call Greg Mertz?" *Id.* Endemano tried to explain what had happened, but Zloto continued interrupting her and told her that she was contradicting herself and that she was lying. *Id.* Because Endemano did not want to argue with Zloto, she asked him to contact the mission operation center for a recording of the conversation, but Zloto refused. *Id.*

In late 2007 or early 2008, Endemano and her partner, FAM Joseph,[2] had an encounter with a Southwest Airlines employee, which led to Endemano and FAM Joseph jointly writing a memorandum discussing the employee's failure to follow policy. *Id.* ¶ 23. Zloto proceeded to "grill" Endemano on the sequence of events and details of what occurred, "yell[ing] and scream[ing]" at her. *Id.* After making Endemano repeat the story several times, Zloto then asked FAM Joseph about the incident and the memorandum. *Id.* FAM Joseph corroborated what occurred and informed Zloto that he and Endemano had jointly written the memorandum. *Id.* It was only after speaking to FAM Joseph that Zloto stopped interrogating Endemano. *Id.*

In August 2008, Endemano was assigned to fly several missions with FAM Richard while his normal partner was on medical leave. *Id.* ¶ 24. During this time period, FAM Richard asked how Endemano felt about becoming permanent partners. *Id.* Endemano agreed that it would be a good idea and asked FAM Richard to make the request to Zloto, because she felt Zloto might be more receptive to a request from FAM Richard than from her. *Id.* Within one or two days, FAM

---

[2] Pursuant to a Court Order, the Clerk was directed to remove the original complaint filed by Endemano from the docket and substitute it with a redacted complaint (the "Amended Complaint") provided by the Secretary that would omit the names and other Sensitive Security Information of the FAMs who were discussed in the complaint. *See* Doc. 10. As with the Amended Complaint, and in a continuing effort to protect the identities of the FAMs, this Order refers to each FAM (other than Endemano) by first name only.

Richard told Endemano that he had spoken with Zloto, who had agreed to make Endemano and FAM Richard partners and that this change would be effective by the next roster. *Id*. However, when Endemano and FAM Richard received their next rosters at the end of September 2008, they had not been assigned as partners. *Id*. Shortly thereafter, FAM Richard contacted Endemano and told her that he had spoken with Zloto again regarding the two of them becoming partners, and that Zloto had said he would make it happen. *Id.* ¶ 25. FAM Richard told Endemano that there was something else Zloto said, but that he was reluctant to disclose it to her. *Id*. He chuckled nervously and told Endemano that Zloto had asked him, "Why, do you want to sleep with her?" *Id*. Endemano was highly upset by this comment and expressed her feelings to FAM Richard, who said, "Maybe I shouldn't have told you this." *Id*. Several weeks later, Endemano confided to FAM Scott about Zloto's comment, and FAM Scott corrected her and stated that he had learned that the actual wording was, "Why? Do you want to fuck her?" *Id*. Endemano asked FAM Scott how he knew this, and he told her that FAM Richard had told him that these were the exact words Zloto used, and that FAM Richard had basically "cleaned it up" when he told her about Zloto's comment. *Id*. Endemano was humiliated as the story quickly spread throughout the offices in Tampa and Orlando and her coworkers questioned her about the incident. *Id*.

On December 10, 2008, in accordance with a new policy concerning Law Enforcement Availability Pay justification, Endemano submitted her timesheet and attached the required justification sheet, which included several flight delays. *Id.* ¶ 27. Zloto told Endemano to correct the justification sheet and required her to specify the cause of each flight delay along with additional information regarding each replacement flight. *Id*. Endemano asked Zloto how he expected her to remember this when that requirement had not been communicated to the FAMs. *Id*. He responded, "You are a law enforcement officer and should be attentive to detail." *Id*. These

details were not required of others, including the two male FAMs present in the room.  *Id*. Endemano walked to a computer and sat down, while Zloto proceeded to lean across the table and scream in her face, "DO YOU HAVE A BRAIN?"  *Id*.  While screaming at Endemano, Zloto came into physical contact with her.[3]  *Id*. ¶¶ 27–28, 35.

Toward the end of 2008, during her performance review, Endemano had a conversation with Zloto regarding sick calls.  *Id*. ¶ 29.  Endemano told Zloto that it was wrong that he demanded a reason when someone called in sick and that he then proceeded to send the reason out in an email for others to see.  *Id*.  Official policy did not require employees to disclose their medical issues unless they were out for an extended period of time.  *Id*.  Endemano believed Zloto's practice in requesting and disclosing this information was an invasion of privacy and unprofessional.  *Id*. Additionally, Endemano was embarrassed and uncomfortable telling her male supervisor that she was sick due to a female medical issue.  *Id*.  However, their conversation failed to resolve the issue and Zloto continued to ask for a reason for Endemano's absences.  *Id*.

At the end of January 2009, Endemano attended a FAMS operational security briefing in a conference room at the airport.  *Id*. ¶ 30.  At the conclusion of the briefing, while she was having a conversation with another FAM, Zloto approached Endemano and asked if she had a "hot date" the night before.  *Id*.  Endemano knew that he was referring to her rapid departure following the "check ride" the previous day and she believed the comment was utterly inappropriate.  *Id*.  Zloto had not mentioned wanting to have a discussion after the flight and Endemano had no desire to delay getting home.  *Id*.  During the check ride, Zloto had given Endemano her performance ratings.  *Id*.  Endemano believed that the performance ratings were completely unjustified and derived from Zloto's biased feelings towards her rather than on her actual performance.  *Id*.  Zloto

---

[3] The Amended Complaint does not allege precisely the manner of the contact.  *See* Doc. 12 ¶ 27.

never offered any explanation as to why Endemano received such low scores, and nothing was noted within any of her previous reviews to indicate such concerns and criticisms. *Id.* In fact, that review was in direct contradiction to Endemano's normal review, which indicated that she met expectations. *Id.*

In April 2009, Endemano participated in training at the Hillsborough County training facility. *Id.* ¶ 32. Zloto was present that day for the purpose of conducting performance reviews in the cafeteria near the training room. *Id.* Zloto entered the training room after the instructors announced that he was there for the performance reviews. *Id.* Endemano was sitting in the front of the training room when Zloto entered and noticed that she had a bandage on her ear, which she had used to cover a recent piercing in accordance with official policy. *Id.* He laughed and remarked, 'Was someone nibbling on your ear last night?" *Id.* Endemano was embarrassed in a room full of men and stated, "Wow. That sounds like an EEO [complaint] in the making." *Id.* Zloto answered, "Go ahead, file it—you're not the first." *Id.*

In May 2009, Endemano turned in her timesheet to Zloto without submitting documentation for scheduled overtime, which was his personal requirement rather than an official Orlando Field Office policy. *Id.* ¶ 33. The informal practice among the squads in general was that the team leader on an international mission was supposed to send an email to all the FAMs on that mission with a breakdown of the hours they worked, including overtime. *Id.* In Endemano's experience, this was not practiced regularly or consistently, and she specifically recalls only one email from a team leader during her entire tenure in the Orlando Field Office. *Id.* After this particular trip, Endemano did not submit the documentation because she had not received the email with the breakdown of time from her team leader. *Id.* Prior to submitting her timesheet, Endemano compared her hours with FAM Scott's timesheet. *Id.* Endemano observed that she and FAM Scott

had listed the same hours and that FAM Scott had also not submitted the required documentation as an attachment to his timesheet.  *Id.*  On May 18, 2009, Zloto sent Endemano an email entitled "T&A pp8 Missing Attachments."  *Id.*  In the email, Zloto referenced that Endemano was late in her submission and that she was missing documentation for annual leave taken on May 8 and May 9, as well as the overtime justification.  *Id.*  Endemano concedes that she was late in her submission.  *Id.*  However, she responded in an email explaining that she had not received any overtime documentation from the Orlando Field Office and pointing out that she was aware that her partner also had not submitted any documentation.  *Id.*  Zloto then replied that Endemano was supposed to receive the documentation from the team leader for the mission.  *Id.*  Endemano knew this and replied once again that she had not received it from the team leader.  *Id.*  Zloto then replied and stated, "Trixy, provide the attachments."  *Id.*  Endemano did not discuss the issue with Zloto again, and she did not provide any further documentation as she believed that the information was Zloto's responsibility.  *Id.*  Shortly thereafter, Endemano contacted FAM Scott to confirm that he had not turned in any overtime documentation, and to see if he had any issues with Zloto regarding the overtime.  *Id.*  FAM Scott stated that he had not submitted the documentation and that Zloto had no issues with him regarding the overtime.  *Id.*  After a couple of weeks, Endemano still had not been paid for the overtime, so she contacted former security assistant Heather Cernan ("Cernan") for assistance.  *Id.*  Cernan told Endemano she would look into it, and eventually Endemano was paid.  *Id.*

On June 3, 2009, Endemano was in the office for training, and Zloto asked her to stay to meet with him at the conclusion of training.  *Id.* ¶ 34.  The two of them met in ATSAC Matt Ryan's ("ATSAC Ryan") office with ATSAC Ryan present.  *Id.*  Zloto handed Endemano a one-page Letter of Counseling ("LOC"), dated May 21, 2009 and entitled, "Failure to Request Annual leave

and Exhaustion of Current Annual leave Balance." *Id*. Endemano read the LOC and, feeling that it was unjust, questioned its validity. *Id*. Zloto explained that the LOC was referring to her failure to request advance leave for leave she took from May 8 through May 16, 2009, and he explained the policy regarding advance leave requests and that Endemano should have known to submit the request. *Id*. Endemano was confused and told Zloto that she was unaware of this policy and that she felt it was his responsibility to make her aware of policies pertinent to her job. *Id*. The official leave policy states that supervisors must make their subordinates aware of policies that affect them. *Id*. Endemano further explained to Zloto that at the time she submitted her leave request she had counted on "Regular Days Off" that ended up changing due to an international mission. *Id*. She also told Zloto that she knew that other male FAMs had exhausted their leave time without repercussions, and that the LOC was nothing more than retaliation for an email she had sent complaining about management. *Id*. During their conversation, Zloto screamed at Endemano and continued to move his chair closer to her until he finally hit her foot and the box of pastries next to her foot. *Id.* ¶ 35. Zloto came into contact with Endemano a second time when his animated hand gestures caused him to touch her hand. *Id*.

The aforementioned email, which Endemano believes was the basis for Zloto's retaliation, was one she sent to Zloto, Administrative ATSAC Randy Busch ("ATSAC Busch"), and Christine Lewandowski on May 30, 2009, concerning a workers compensation claim she made on May 20, 2009. *Id.* ¶ 36. In the email, Endemano expressed dissatisfaction with management because of communication breakdowns. *Id*. Endemano also expressed dissatisfaction with the fact that, without her knowledge, she had been taken off the schedule due to a traumatic injury when, in fact, she was medically fit and capable of working. *Id*. In fact, Endemano had been working all week. *Id*. ATSAC Busch was upset about Endemano's May 30 email and told her that it took him

three days to calm down over it because of the reference to "management". *Id*. Endemano told ATSAC Busch that she was actually upset with Zloto, and not ATSAC Busch, since Zloto had been uncooperative, condescending, and disrespectful when she called him to discuss the matter. *Id*. Moreover, the LOC incorrectly listed the absence as occurring in April 2009 when it really occurred in May 2009, and if Zloto had reviewed Endemano's leave balance in April 2009, he would have seen that she had sufficient annual leave for the dates she was on leave. *Id*.

On October 5, 2009, Endemano submitted a travel voucher to Zloto, and attached receipts for expenses claimed for various tolls. *Id.* ¶ 37. Zloto responded that day with an email stating that he was returning the voucher and that she needed to resubmit the toll documentation without omissions. *Id*. That afternoon, Endemano sent an email to Zloto stating that she had submitted all pertinent information and that there was no reason why she should be required to resubmit the voucher with personal information that did not pertain to her work travels. *Id*. Endemano also informed Zloto that she knew he had already approved vouchers with redacted personal information from other individuals and that she was being singled out and treated differently from her male counterparts. *Id*. Endemano knew this because prior to sending her responsive email to Zloto, she had called FAM Scott to complain about the issue. *Id*. FAM Richard was in the office with FAM Scott at the time of the phone call, and he told FAM Scott to tell Endemano that he had submitted his voucher without personal information, as well, but that his voucher had already been approved. *Id*.

On October 6, 2009, Zloto replied that he did not recall approving travel vouchers with redacted information from other individuals. *Id.* ¶ 38. Endemano contacted FAM Richard directly and he confirmed that his voucher did not contain all his personal information and suggested that she review his voucher in his inbox. *Id*. Endemano reviewed the voucher and saw that FAM

Richard's personal travel information had not been redacted, but he had omitted his personal information. *Id*. Specifically, his toll statement was in a different format, which enabled him to omit his transponder number and his customer number. *Id*. Endemano replied to Zloto that she did not understand what information he thought was lacking, and she resubmitted the voucher showing the information in a new format that was similar to the one used by FAM Richard, this time including the toll locations for the expenses claimed. *Id*. Approximately two hours later, Endemano received an email from Zloto that copied the Assistant Special Agent in Charge, Mr. Cook ("ASAC Cook"),[4] and advised that Zloto had spoken with FAM Richard about some personal information that had not been submitted, but that, unlike Endemano, FAM Richard had not *redacted* anything. *Id*. Zloto directed Endemano to submit documentation verifying all information in the voucher and stated that he would like to meet with her regarding the matter. *Id.*; *see* Doc. 12 at 27. On October 7, 2009, Endemano, believing that any further attempts at reimbursement would be futile, replied with one final email, copying ASAC Cook, in which she stated that she was declining a meeting with Zloto due to the fact that she did not believe that he wanted to find a resolution to the matter, but only wanted to belittle her. Doc. 12 ¶ 38. In a subsequent meeting, ASAC Cook told Endemano that he would be contacting Zloto and advising him to approve her voucher immediately. *Id.* ¶ 39.

A few days prior to the travel voucher incident, on October 2, 2009, FAM Kevin had sent Endemano her schedule of duties for the next day. *Id.* ¶ 40. Endemano believed that some of the scheduled hours were incorrectly allocated, and she and FAM Kevin engaged in a series of emails regarding the matter. *Id*. In a final email, FAM Kevin advised that Endemano's hours had been

---

[4] ASAC Cook held the second-highest management position in the Orlando Field Office and was responsible for the performance of Zloto. Doc. 12 ¶ 38.

"adjusted to reflect the correct time," but Endemano noticed that there was now an extra assignment. *Id*. Endemano believed that this was done out of spite and that FAM Kevin was upset that she had made him correct the original email various times. *Id*. However, Endemano conducted her assignments and forgot about the incident. *Id*. Three days later, on October 5, 2009, Endemano was leaving the office and was approached by FAM Kevin, who asked her in a mocking manner if she had enjoyed the extra time she had been assigned. *Id*. On October 6, 2009, Endemano emailed Zloto, who was FAM Kevin's supervisor, regarding the matter, with a copy to FAM Kevin. *Id.* ¶ 41. Approximately one week later, Zloto had not replied or addressed the matter with Endemano, causing her to believe that Zloto was reinforcing FAM Kevin's retaliation. *Id*. Endemano's dealings with FAM Kevin had previously been positive, but when he was promoted and began reporting to Zloto, Endemano noticed that FAM Kevin's demeanor had changed. *Id*. Endemano spoke with several other FAMs, who agreed that FAM Kevin had acquired an arrogant demeanor under Zloto's supervision. *Id*.

On October 8, 2009, Endemano was contacted by ASAC Cook, who asked her to report to the Orlando Field Office as soon as possible to discuss the allegations from her October 7 email to Zloto regarding the travel voucher. *Id.* ¶ 42. Later that day, Endemano met with ASAC Cook and Supervisory Agent Sonya Hightower ("Hightower") for approximately 30 minutes and outlined her concerns about Zloto. *Id*. ASAC Cook asked Endemano to provide a written memorandum breaking down her email with more specific details. *Id*. Hightower then approached the Special Agent in Charge, Joseph Samuels ("SAC Samuels"), and relayed Endemano's complaints of discrimination and retaliation. *Id*. SAC Samuels did not make any meaningful comment to Hightower, nor was Hightower directed to take steps to address Zloto's conduct. *Id*. ASAC Cook

directed Endemano to return to Tampa and continue reporting to Zloto, and told her that she should be respectful of Zloto and do as she was instructed.  *Id.*

During her employment with the FAMS, Endemano learned that she was not the first woman to complain about Zloto's treatment of women.  *Id.* ¶ 43.  For example, Endemano had been told by many of her coworkers about FAM Dawn's ongoing battle with Zloto over her toll receipts years ago.  *Id.*  FAM Dawn, after seeing no resolution, wrote to Orlando management that she would no longer be claiming her tolls since she was exhausted from fighting with Zloto about every toll receipt.  *Id.*  Zloto's actions caused FAM Dawn a great deal of emotional distress, which eventually forced her to leave the FAMS.  *Id.*  In addition, Endemano learned that on one occasion Zloto, responding to an incident where a female passenger had allowed her dog to roam free in an aircraft, angrily told the passenger that she needed to be slapped.  *Id.* ¶ 44.  Finally, Endemano had been told that when another female FAM, FAM Sukeena, had visited the Tampa office on business with a male FAM, Zloto made comments to her about where the mall was located and encouraged her to go shopping while the men talked business.  *Id.* ¶ 45.

### B.    Procedural History

On October 16, 2009, Endemano filed an informal complaint of sex discrimination and hostile work environment with an Equal Employment Opportunity ("EEO") counselor in the TSA's Office of Civil Rights and Liberties ("OCRL").  *Id.* ¶ 10; Doc. 21-1, Declaration of Sonja DeWitt ("DeWitt Dec."), ¶ 4.  On February 13, 2010, Endemano filed a formal complaint with the OCRL.  Doc. 12 ¶ 10; DeWitt Dec. ¶ 6.  On November 2, 2010, the OCRL provided Endemano with a notice of her right to request a hearing before an Equal Employment Opportunity Commission ("EEOC") administrative judge or, alternatively, to receive a Final Agency Decision ("FAD").  DeWitt Dec. ¶ 7.  Endemano initially requested a hearing before an EEOC administrative judge, but later withdrew her request for a hearing and requested a FAD.  *Id.* ¶¶ 8–

9.   The OCRL then issued a FAD concluding that Endemano failed to prove that the TSA discriminated against her.  *Id.* ¶ 10.

On February 28, 2013, within 90 days of her receipt of the FAD, Endemano filed a complaint with this Court.  *See* Doc. 1; Doc. 12 ¶ 11.  The Amended Complaint, *see supra* n. 2, asserts the following claims:  (1) Count I – sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) Count II – hostile work environment in violation of Title VII; and (3) Count III – retaliation in violation of Title VII.  *See* Doc. 12.  On August 13, 2013, the Secretary filed the instant Motion to Dismiss, seeking dismissal of the Amended Complaint in its entirety.  *See* Doc. 21.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss, a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient.  *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Mere naked assertions, too, are not sufficient.  *Id.*  A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face."  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The Court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint.  *Id.*  Therefore, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679.

### III.     DISCUSSION

#### A.     Sex Discrimination

Title VII requires that personnel actions affecting Federal Government employees "be made free from any discrimination based on race, color, religion, sex, or national origin."[5]   42 U.S.C. § 2000e-16(a).   Before bringing a Title VII claim in federal court, however, an aggrieved employee must exhaust her administrative remedies.   *See* 42 U.S.C. § 2000e-16(c); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976); *Brown v. Snow*, 440 F.3d 1259, 1262 (11th Cir. 2006).   One such requirement is that the employee must file a formal complaint with the agency that allegedly discriminated against her.   *Snow*, 440 F.3d at 1262; 29 C.F.R. § 1614.106.   An additional requirement is that, prior to filing the formal complaint with the agency, the employee must initiate contact with an EEO counselor within 45 days of the alleged discriminatory act or, in the case of a personnel action, within 45 days of the effective date of the personnel action, in an attempt to informally resolve the matter.   *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008); *Robinson v. Jojanns*, 147 F. App'x 922, 924 (11th Cir. 2005); 29 C.F.R. § 1614.105(a)(1).   Failure to initiate contact within the 45-day period generally results in the claims at issue being barred for failure to exhaust administrative remedies.   *Shiver*, 549 F.3d at 1344.

In its Motion to Dismiss, the Secretary argues that because Endemano did not initiate contact with an EEO counselor until October 16, 2009, any claims she may have had for actions occurring more than 45 days prior to that date—i.e., those actions occurring before September 1, 2009—are barred for failure to exhaust administrative remedies.   Doc. 21 at 5–7.   In response, Endemano does not dispute that claims for actions occurring before September 1, 2009 are barred.

---

[5] The protections afforded by 42 U.S.C. § 2000e-16(a) are equivalent to those granted by the more well-known anti-discrimination provision of Title VII, 42 U.S.C. § 2000e-2(a), which covers private employers.   *See Putman v. Sec'y, Dep't of Veterans Affairs*, 510 F. App'x 827, 829 (11th Cir. 2013); *Clark v. Potter*, 232 F. App'x 895, 896 (11th Cir. 2007).

*See* Doc. 24 at 6.  Rather, she only seeks to hold the Secretary liable on her Title VII discrimination claim with respect to the two *post*-September 1, 2009 incidents—Zloto's failure to authorize reimbursement for Endemano's travel voucher relating to tolls, and FAM Kevin's rescheduling of Endemano's duties, both of which occurred in October 2009.  *Id.* at 6–10.  Because there is no dispute that Endemano's claims for actions occurring before September 1, 2009 are barred, the Court will grant the Secretary's Motion to Dismiss as to the Title VII discrimination claim with respect to such actions.

With respect to the two post-September 1, 2009 incidents, the Secretary asserts that Endemano fails to state a claim for sex discrimination based on disparate treatment.  *Id.* at 7–11. The Court agrees.  To establish a prima facie claim of disparate treatment, a plaintiff must demonstrate that:  (1) she was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected class more favorably.  *Hopkins v. Saint Lucie Cnty. Sch. Bd.*, 399 F. App'x 563, 565 (11th Cir. 2010); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  Although a plaintiff need not *prove* these elements at the pleading stage, the "ordinary rules for assessing the sufficiency of a complaint [still] apply," and the plaintiff must allege sufficient factual matter to support her claim under the *Iqbal* standard.  *Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 396 (11th Cir. 2012).  The Secretary argues that with respect to the two post-September 1, 2009 incidents, Endemano fails to properly allege that she was treated differently from her male counterparts or that she suffered an adverse employment action.  Doc. 21 at 7–11.

With respect to FAM Kevin's modification of Endemano's work schedule, the Court agrees that the Amended Complaint fails to include any allegation from which the Court can reasonably

infer that the modification was due to Endemano's sex.  In fact, the Amended Complaint states that the modification was done "out of spite" because FAM Kevin "was upset that she had made him correct the email various times."  Doc. 12 ¶ 40.  In addition, the Amended Complaint alleges that FAM Kevin mockingly asked Endemano if she enjoyed her extra assignment, and that FAM Kevin had become "arrogant" since he began reporting to Zloto.  *Id.* ¶¶ 40–41.  There is simply nothing in these allegations to support the inference that FAM Kevin was treating Endemano differently from male counterparts based on her sex.

Moreover, FAM Kevin's alleged modification of Endemano's work schedule does not amount to an adverse employment action.  To establish an adverse employment action in a Title VII discrimination claim, an employee "must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  "Although [Title VII] does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  *Id*.  Put simply, "the protections of Title VII simply do not extend to everything that makes an employee unhappy."  *Id.* at 1242.  "[A]pplying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on [her] disagreement with [her] employer's reassignment of job tasks."  *Id.* at 1244.  Courts have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm.  *Id*.

Here, FAM Kevin's modification of Endemano's work schedule by adding an assignment cannot be said to be a serious and material change in the terms, conditions, or privileges of her

employment.  For one, FAM Kevin's addition of a *single* extra assignment to Endemano's schedule on *one* occasion cannot be said to be a "serious and material" change.  Moreover, Endenamo cannot sincerely claim that the additional assignment caused her tangible harm; in fact, the Amended Complaint states that she simply conducted the additional assignment and "forgot about the incident."  *See* Doc. 12, ¶ 40. Courts have consistently held that a mere increase in workload, unaccompanied by tangible harm, does not amount to an adverse employment action. *See Brown v. Lamberti*, No. 09-60494-CIV, 2010 WL 4179313, at *10 (S.D. Fla. Oct. 20, 2010) (finding that the long hours the plaintiff worked during Hurricane Wilma as an emergency responder fell "squarely into the category of 'increased work loads'" and were therefore not adverse employment actions); *Ausby v. Florida*, 624 F. Supp. 2d 1353, 1364 (M.D. Fla. 2008) (concluding that an employee's increased caseload did not amount to an adverse employment action where the employee failed to show tangible harm); *McGuire v. Miami-Dade Cnty.*, 418 F. Supp. 2d 1354, 1359 (S.D. Fla. 2006) (finding that the plaintiff did not establish an adverse employment action where she merely alleged that she had been required to perform job duties that were excessive).  Accordingly, Endemano has failed to adequately allege that she suffered an adverse employment action with respect to FAM Kevin's modification of her schedule.  Due to this deficiency, as well as Endemano's failure to adequately allege that FAM Kevin's modification of her schedule caused her to be treated differently from her male colleagues, the Court will grant the Secretary's Motion to Dismiss as to the Title VII discrimination claim with respect to the schedule modification.

As to Zloto's rejection of Endemano's travel voucher, Endemano has adequately alleged that she was treated differently from her male colleague, FAM Richard, because his travel voucher, which was also missing information, was approved by Zloto while hers was not.  Doc. 12 ¶¶ 37–

38.   The Secretary attempts to argue that Endemano and FAM Richard were not similarly situated because Endemano redacted information from her voucher while FAM Richard simply failed to include certain information in his voucher.  Doc. 21 at 9.  This distinction is not material for purposes of this analysis.  The key point is that Zloto approved FAM Richard's voucher, which was missing information, while rejecting Endemano's voucher, which was also missing information.  Equally unavailing is the Secretary's argument that Zloto "had spoken" with FAM Richard about the missing information, and therefore there was not disparate treatment.  *See id.* The fact that Zloto "spoke" with FAM Richard about the missing information does nothing to obviate the critical point—that Zloto approved FAM Richard's voucher while rejecting Endemano's.

Notwithstanding this finding, the Court concludes that Endemano has failed to state a claim for discrimination as to Zloto's rejection of the voucher because such an action does not constitute an adverse employment action.  The rejection of a voucher for toll expenses cannot be said to be a *serious and material* change in the terms, conditions, or privileges of Endemano's employment. Courts have repeatedly rejected the argument that an employer's failure to reimburse expenses amounts to an adverse employment action.  *See Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (holding that an employer's failure to reimburse $156.89 in travel expenses did not amount to an adverse employment action); *Benningfield v. City of Houston*, 157 F.3d 369, 376–77 (5th Cir. 1998) (holding that an employer's failure to reimburse travel expenses was an "administrative matter" and not an adverse employment action); *Davis v. Carey*, 63 F. Supp. 2d 361, 370 (S.D.N.Y. 1999) (holding that a police department's denial of an officer's request for reimbursement of $150 for an undercover drug purchase was "too trivial and inconsequential" to amount to an adverse employment action).  Moreover, Endemano's assertion that her reputation

was "damaged" because ASAC Cook learned about the voucher incident is conclusory, and she

fails to allege any tangible harm.  Accordingly, Zloto's alleged rejection of the voucher does not

amount to an adverse employment action, and the Court will grant the Secretary's Motion to

Dismiss as to the Title VII discrimination claim with respect to this incident.

### B.      Retaliation

Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate

against an employee "because [s]he has opposed any practice made an unlawful employment

practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a);

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010).  The protections of

42 U.S.C. § 2000e-3(a), which cover private employers, apply equally to employees of the Federal

Government pursuant to 42 U.S.C. § 2000e-16(a).  *Wiggins v. Sec'y, Dep't of Army*, 520 F. App'x

799, 800 (11th Cir. 2013) (citing *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1243

(11th Cir. 1998)).

In its Motion to Dismiss, the Secretary argues that Endemano did not raise the issue of

retaliation in her formal or informal EEO complaints, and that she is therefore barred from bringing

a retaliation claim because she failed to exhaust her administrative remedies.  Doc. 21 at 20–21.

Endemano does not dispute that her EEO complaints failed to specifically allege retaliation, but

she maintains that her retaliation claim grew out of her complaints of discrimination and hostile

work environment, thereby permitting her to bring a retaliation claim in this action.  Doc. 24 at 18.

With respect to the requirement that a claimant exhaust her administrative remedies, the

Eleventh Circuit has explained:

> The purpose of exhaustion is to permit the department the first opportunity to
> investigate the alleged discriminatory or retaliatory practices, and a plaintiff's
> judicial complaint is thereby limited by the scope of the investigation that can

reasonably be expected to grow out of the administrative charge of discrimination or retaliation. *See Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004). The proper inquiry is, therefore, whether the plaintiff's judicial complaint was like or related to, or grew out of, the administrative allegations. *See id.* at 1280. Judicial claims are allowed if they "amplify, clarify, or more clearly focus" the charges made before the agency, and, given that we are reluctant to allow procedural technicalities to bar Title VII claims, the scope of the administrative charges should not be strictly construed. *See id.* at 1279–80 (quotation omitted).

*Basel v. Sec'y of Def.*, 507 F. App'x 873, 875 (11th Cir. 2013).

Although Endemano's EEO complaints may not have specified retaliation, the complained-of conduct in the EEO filings included the June 2009 incident where Zloto issued a LOC to Endemano for violating the annual leave policy, which she believed was retaliation for writing an email in which she expressed her dissatisfaction with management. *See* Doc. 21-2 at 3. As such, the OCRL's investigation of her sex discrimination and hostile work environment complaints could be reasonably expected to uncover evidence of retaliation. Given the strict construction accorded to procedural bars to Title VII claims, the Court finds that Endemano's retaliation claim reasonably grew out of her EEO complaints. *See Gregory*, 355 F.3d at 1280 (holding that a claimant's retaliation claim was not administratively barred for failing to specifically allege retaliation on the EEOC charge where "[a]n EEOC investigation of her race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation."). Notwithstanding this finding, however, the Court does find that Endemano's retaliation claim with respect to the June 2009 LOC is time-barred because she did not consult with an EEO counselor within 45 days of the issuance of the LOC. *See supra*, Part III.A.

Moreover, even assuming that Endemano's EEO complaints could have reasonably uncovered evidence of retaliation for incidents occurring *on or after* September 1, 2009, she has failed to state a claim for retaliation with respect to such incidents. To establish a prima facie case

of retaliation, a plaintiff must show that:  (1) she engaged in statutorily protected conduct; (2) she suffered adverse employment action; and (3) there is "some causal relation" between the two events.  *Alvarez*, 610 F.3d at 1268 (quoting *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008)).  To qualify as "statutorily protected conduct," a plaintiff's opposition must be to a "practice made unlawful by [Title VII.]"  *Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 786 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 981 (U.S. 2013).  In the Amended Complaint, there is no allegation that Endemano expressed her opposition to purported sex discrimination in the workplace at any time prior to her filing of the EEO complaints.  Accordingly, Endemano has failed to state a claim for retaliation, and the Secretary's Motion to Dismiss will be granted as to this claim.

### C.    Hostile Work Environment

The Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated," thereby giving rise to a hostile work environment claim.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted).  Before turning to the merits of Endemano's hostile work environment claim, the Court first addresses the Secretary's argument that under *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and Eleventh Circuit precedent interpreting *Morgan*, any acts of discrimination or retaliation occurring before September 1, 2009 are time-barred and cannot be considered as part of Endemano's hostile work environment claim.

In *Morgan*, the Supreme Court considered "whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside [the timely-filing] period."  536 U.S. at 105. The Court separated its analysis into two parts—one for "discrete acts" of discrimination or retaliation, and the other for hostile work environment claims.  *See id.* at 110–21.  The Court

observed that "discrete acts" were those such as termination, failure to promote, denial of transfer, or refusal to hire. *Id.* at 114. Those acts "are easy to identify," and each "constitutes a separate actionable 'unlawful employment practice.'" *Id.* The Court reiterated a principle from its prior holdings, observing that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," because "each discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. The Court noted that untimely acts could be used "as background evidence in support of a timely claim," but they could not themselves form the basis for liability. *Id.* The Court distinguished discrete acts from hostile work environment claims, stating that "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." *Id.* at 115. With respect to hostile work environment claims, the unlawful employment practice does not occur on any particular day, but rather "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Thus, the Court held that "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period" for filing the charge. *Id.* at 122. Accordingly, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.*

The Eleventh Circuit has placed great weight on *Morgan*'s distinction between hostile work environment claims and discrete acts of discrimination and retaliation. *See McCann*, 526 F.3d at 1378–79; *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008); *Smithers v. Wynne*, 319 F. App'x 755, 756–57 (11th Cir. 2008); *Chambless v. Louisiana-Pac.*

*Corp.*, 481 F.3d 1345, 1349–50 (11th Cir. 2007); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178–80 (11th Cir. 2005), *aff'd*, 550 U.S. 618 (2007).   Discrete acts of discrimination and retaliation "cannot be brought under a hostile work environment claim that centers on 'discriminatory intimidation, ridicule, and insult.'" *McCann*, 526 F.3d at 1379 (quoting *Morgan*, 536 U.S. at 116).   Hiring decisions, work assignments, and instances of retaliation constitute discrete acts that cannot be considered part of a hostile work environment claim. *Davis*, 516 F.3d at 970.  Therefore, "[i]n determining whether claims are timely, courts must distinguish between allegations which charge discrete acts of discrimination or retaliation from allegations that charge repeated acts or events centering on discrimination, intimidation, and ridicule." *Freeman v. City of Riverdale*, 330 F. App'x 863, 866 (11th Cir. 2009).   However, "[w]here [a timely] discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim.  The pivotal question is whether the timely discrete acts are sufficiently related to the hostile work environment claim." *Chambless*, 481 F.3d at 1350.

Turning to the allegations in the Amended Complaint, the Court notes that, as explained previously, Endemano alleges only two timely acts—Zloto's rejection of Endemano's travel voucher and FAM Kevin's rescheduling of Endemano's duties, both of which occurred in October 2009.  *See supra*, Part III.A.  Under *Morgan*, the nine untimely acts occurring before September 1, 2009 are time barred unless they can be considered part of the same hostile work environment claim as one of the two timely acts.  *See Morgan*, 536 U.S. at 122.

The Secretary argues that, for one, FAM Kevin's rescheduling of Endemano's duties cannot be considered part of an actionable hostile work environment claim because there is no allegation, nor can it be reasonably inferred, that the rescheduling was due to Endemano's sex.

Doc. 21 at 13.  The Secretary is correct.  "For an act to be considered part of an actionable hostile work environment claim, it must be of 'a sexual or gender-related nature.'"  *Menefee v. Montgomery Cnty. Bd. of Educ.*, 137 F. App'x 232, 233 (11th Cir. 2005) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)).  The Court has already found that the Amended Complaint fails to include any allegation from which the Court can reasonably infer that FAM Kevin's modification of Endemano's schedule was due to her sex.  *See supra*, Part III.A. Accordingly, this act cannot be considered part of an actionable hostile work environment claim, and cannot be used to "save" the untimely acts.  *Menefee*, 137 F. App'x at 233.

This leaves Zloto's rejection of Endemano's travel voucher as the only timely act that could potentially "save" the nine untimely acts to form a hostile work environment claim.  The Secretary argues that Zloto's rejection of the voucher cannot "save" three of the untimely acts because they are not sufficiently related to the voucher incident.  Doc. 21 at 13–14.  These three untimely acts are:  (1) Zloto's question to a male FAM, "Why?  Do you want to fuck her?", when referring to Endemano; (2) Zloto asking Endemano if she had a "hot date" the night before; and (3) Zloto asking Endemano, "Was someone nibbling on your ear last night?"  *Id*.  The Court, however, finds that these three sexually-charged comments are sufficiently related to Zloto's rejection of Endemano's travel voucher because, viewing the allegations in the light most favorable to Endemano, Zloto's refusal to authorize reimbursement is the same type of "discriminatory intimidation, ridicule, and insult" that characterized the sexually-charged comments.  *Chambless*, 481 F.3d at 1350.  Accordingly, those three untimely acts can be "saved" by the timely travel voucher incident and asserted as part of a single hostile work environment claim.

As to the remaining six untimely acts, the Secretary seeks to exclude them on the basis that they are discrete acts that were required to be timely challenged as separate discrimination or

retaliation claims, and that they are not sufficiently related to Zloto's rejection of the travel voucher. Doc. 21 at 14–16. The six untimely acts are: (1) Zloto screaming at Endemano, "How can you be so dumb as to call Greg Mertz?" in response to her calling out of work; (2) Zloto yelling at Endemano regarding a memorandum she wrote about a flight attendant's failure to follow policy, and only stopping when a male FAM corroborated her story; (3) Zloto screaming at Endemano, "DO YOU HAVE A BRAIN?" and coming into physical contact with her; (4) Zloto continuing to ask Endemano for a reason why she was taking sick leave after she complained about it, even though Endemano felt uncomfortable disclosing female medical issues; (5) Zloto requiring Endemano to submit documentation for annual leave and overtime justification when FAM Scott was not required to do so; and (6) Zloto screaming at Endemano and coming into contact with her when she complained that the LOC was retaliation. *Id.* The Court finds that each of the foregoing acts are appropriately considered to be part of a hostile work environment claim rather than discrete acts, because they center on intimidation, ridicule, and insult. *See McCann*, 526 F.3d at 1379. The six acts are not hiring decisions, work assignments, or instances of retaliation, each of which are deemed to be discrete acts. *See Davis*, 516 F.3d at 970. Moreover, the acts are sufficiently related to Zloto's rejection of the travel voucher because they are part of the same pattern of intimidation, ridicule, and insult. *Chambless*, 481 F.3d at 1350. Therefore, the six untimely acts can be "saved" by the timely travel voucher incident and asserted as part of a single hostile work environment claim.

The Secretary also attempts to exclude from Endemano's hostile work environment claim her allegations that other women suffered from Zloto's abusive conduct. Doc. 21 at 14 n.7. The Secretary acknowledges that an employer's conduct towards other employees can be used in a hostile work environment claim. *Id.* (citing *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d

798, 811 (11th Cir. 2010)).  Nonetheless, the Secretary asserts that Endemano failed to exhaust her administrative remedies with respect to Zloto's abusive conduct towards other women because Endemano did not include those incidents in her EEO complaints.  *Id.*  The Court has only been provided with the OCRL's response rather than the actual EEO complaints.  Therefore, at this stage of the litigation, the Court has insufficient information to exclude the incidents.  The Secretary also attempts to exclude the other women's incidents by arguing that Endemano fails to allege that she was aware of the incidents while the hostile work environment was ongoing.  Doc. 21 at 14 n.7.  However, construing the Amended Complaint in the light most favorable to Endemano, the Court finds that it can be reasonably inferred that she knew about the incidents during the hostile work environment period.  Accordingly, Zloto's abusive conduct towards other women can be considered as part of Endemano's hostile work environment claim.

Finally, the Secretary argues that even if the untimely acts can be considered part of Endemano's hostile work environment claim, the Amended Complaint fails to state a claim for hostile work environment because the alleged harassment was not sufficiently severe and pervasive.  *Id.* at 16–19.  To plead a claim for hostile work environment, the plaintiff must allege that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her membership in the protected group; (4) *it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment*; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.  *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010) (emphasis added).  Notably, however, "a Title VII complaint need not allege facts sufficient to make out a classic . . . prima facie case," although "it must provide enough factual matter (taken

26

as true) to suggest" intentional discrimination.  *Davis*, 516 F.3d at 974 (internal citations and quotations omitted).

The Court finds that Endemano has alleged enough factual matter which, taken as true, states a plausible claim for hostile work environment.  The Amended Complaint alleges that over a roughly two-year period, Zloto made three sexually-charged comments to or regarding Endemano, that he told an airline passenger that she needed to be slapped, and that he told another female FAM where the mall was located and encouraged her to go shopping while the men talked business.  When Endemano suggested, in a room full of men, that she would file an EEO complaint regarding one of the sexually-charged comments, Zloto answered, "Go ahead, file it—you're not the first," thereby leaving the impression that sexual harassment was tolerated and pervasive in the workplace.  In addition, the Amended Complaint alleges that Zloto screamed at Endemano on a number of occasions, including two incidents where he came into contact with her.  Furthermore, the allegations reveal that Zloto's requirements of Endemano were often different from those he imposed on male FAMs, raising the inference that he was attempting to bully her due to her sex. Taken together, and interpreted in the light most favorable to Endemano, these allegations sufficiently claim that the harassment was severe and pervasive.[6]  Accordingly, the Secretary's Motion to Dismiss will be denied as to the hostile work environment claim.

Accordingly, it is hereby **ORDERED:**

1.    The Secretary's Motion to Dismiss (Doc. 21) is **GRANTED in part** and **DENIED in part**:

---

[6] For these reasons, the Court also rejects the Secretary's arguments that Endemano does not sufficiently allege that the abusive conduct was related to her sex or that the conduct interfered with her work performance. *See* Doc. 21 at 18, 19.

    a.     Counts I and III are **DISMISSED with prejudice** to the extent they seek to impose liability for actions occurring before September 1, 2009, because those actions are time-barred.

    b.     Counts I and III are **DISMISSED without prejudice** to the extent they seek to impose liability for actions occurring on or after September 1, 2009, because Endemano failed to state a claim upon which relief can be granted as to such actions.

    c.     In all other respects, the Secretary's Motion to Dismiss is **DENIED**.

2.    To the extent that Endemano wishes to re-plead claims dismissed without prejudice, she is granted leave to file a Second Amended Complaint within **TWENTY-ONE (21)** days of the date of this Order, which cures the deficiencies noted in this Order. Otherwise, this action will proceed on the Amended Complaint.

**DONE** and **ORDERED** in Orlando, Florida on March 19, 2014.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties